```
IN THE UNITED STATES DISTRICT COURT
  FOR THE WESTERN DISTRICT OF VIRGINIA
            ABINGDON DIVISION
```

| | |
|---|---|
| **ROBERT A. BYRD,** | ) |
| | ) |
| Plaintiff, | ) Case No. 1:09CV00030 |
| | ) |
| v. | ) **OPINION** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) By: James P. Jones |
| **COMMISSIONER OF** | ) Chief United States District Judge |
| **SOCIAL SECURITY,** | ) |
| | ) |
| Defendant. | ) |

*E. Craig Kendrick, Browning, Lamie, & Gifford, P.C., Abingdon, Virginia, and John M. Lamie, Browning, Lamie, & Gifford, P.C., Lebanon, Virginia, for Plaintiff; Eric P. Kressman, Acting Regional Chief Counsel, Region III, and Andrew C. Lynch, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner of Social Security (the "Commissioner") .

I

Plaintiff Robert A. Byrd, filed this action challenging the final decision of the Commissioner denying his claim for supplemental security income and disability insurance benefits pursuant to Titles II and XVI of the Social Security Act ("Act")

respectively, 42 U.S.C.A. §§ 401- 433, 1381-1383d (West 2003 & Supp. 2009). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g) and § 1383(c)(3).

Byrd filed for benefits on May 4, 2007, alleging disability beginning August 16, 2004. His claim was denied initially and upon reconsideration. An administrative law judge ("ALJ") held a video hearing on October 2, 2008 in which both Byrd, represented by counsel, and a vocational expert ("VE") testified. The ALJ denied Byrd's claim on November 26, 2008. The agency's decision became final when the Social Security Administration's Appeals Council denied Byrd's request for review on February 9, 2009. Exactly one month later, Byrd filed his Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is ripe for decision.

II

Byrd was thirty-three-years old when he filed for disability, a person of younger age under the regulations. *See* 20 C.F.R. § 404.1563(c) (2009). Byrd graduated from high school and studied for two years at Southwest Virginia Community College. Before Byrd stopped working on December 21, 2006, Byrd was a telephone interviewer at a firm in Grundy, Virginia. Previously, Byrd had also

worked as a compressor assembler, a stock clerk, a grocery store bagger, and a fast food worker.

Byrd asserts that his disability began on August 16, 2004. At the administrative hearing before the ALJ on October 2, 2008, Byrd presented the following medical evidence to substantiate his disability claim.

On August 20, 2004 and October 24, 2004, Byrd went to the emergency room claiming that he had ingested an overdose of medication in an attempt to commit suicide. On both occasions, Byrd was immediately admitted to a psychiatric facility, Clearview Center, where doctors diagnosed Byrd with severe major depression with psychotic features, borderline personality disorder, and a history of polysubstance abuse. The treating physicians noted that his psychological ailments were negatively affected by his separation from his wife. On Byrd's second discharge, the treating physician rated him as a 60 on the Global Assessment Function (the "GAF") scale,[1] indicating the doctor considered his symptoms or impairments in social or occupational functioning moderate bordering on mild. *Id.*

---

[1] The 100-point GAF scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," where 1 constitutes the most severely impaired functioning and 100 is superior functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM IV* 32 (4th ed. 1994).

Following his hospitalization, Byrd was to visit Cumberland Mountain Community Service Board ("Cumberland") regularly for follow-up treatment and medication. Cumberland terminated the services it provided to Byrd in 2005 after he repeatedly failed to show for his appointments. On May 2, 2007, two days before applying for disability benefits, Byrd returned to Cumberland for mental health treatment. He again failed to make several of his appointments.

On July 2, 2007, Byrd was examined by Tonya McFadden, a state agency psychologist. McFadden diagnosed Byrd with major depression, recurrent with psychotic features, borderline personality disorder, a history of polysubstance abuse, and possible bipolar disorder. McFadden found that Byrd scored a 50 on the GAF scale, indicating she considered his symptoms or impairments in social or occupational functioning bordering on moderate. *Id.*

Dr. Ravi Titha, another state agency medical consultant, also examined Byrd. Dr. Titha diagnosed Byrd with depression, bipolar disorder, personality disorder with impulse control, and a history of drug overdoses. Dr. Titha wrote that Byrd's "appearance, behavior and speech were normal. Thought process was slow, content was normal. Concentration was poor. Attention was poor. Judgment and insight were normal. Attitude and degree of cooperation [were] normal. Persistence and pace were normal." (R. at 289.)

Byrd's final examination was conducted on September 25, 2008 by a private licensed clinical psychologist, Dr. Pamela Tessnear, who found that Byrd suffered from bipolar and personality disorders, and possibly schizoid affective and anxiety disorders. She scored him at a 48 on the GAF scale—within the "serious" range. However, when she administered the Personality Assessment Inventory test, Byrd's score "strongly suggest[ed] a deliberate attempt to feign severe symptoms of mental illness." (R. at 358.)

After reviewing the evidence Byrd presented, the ALJ found that Byrd suffered from the severe impairments of bipolar disorder or depression, borderline personality disorder, neck problems, and a history of substance abuse. The ALJ concluded that Byrd's impairments were not the medical equivalent of any of the agency's listed disabilities, either alone or in combination. The ALJ determined that Byrd had "the residual functional capacity to perform medium work" that only involved "simple, routine, unskilled, repetitive tasks with no interaction with the general public." (R. at 22.)

The ALJ concluded that Byrd's functional capacity prevented him from performing his past relevant work. Although Byrd was employed sporadically after the alleged onset of his disability, each work attempt was short-lived because his medical conditions prevented him from performing his job duties on a regular basis.

Therefore, the ALJ determined that those limited periods of employment were merely unsuccessful work attempts and not substantial gainful activity.

The VE testified that someone with Byrd's limitations would be able to perform the duties of a janitor, a cleaner, and a parking garage attendant. The VE estimated that there were approximately 17,000 such jobs in the region and over 2,000,000 in the national economy. Relying on this testimony, the ALJ concluded that Byrd was able to perform work that exists in significant numbers the national economy and was therefore not disabled.

III

The plaintiff bears the burden of proving that he is suffering from a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant (1) has worked during

the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2009). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *See id.*; *Bennett v. Sullivan*, 917 F.2d 157, 159 (4th Cir. 1990). The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *See* 20 C.F.R. §§ 416.920(a)(4), (e) (2009); *see also Reichenbach v. Heckler*, 808 F.2d 309, 311 (4th Cir. 1985).

In accordance with the Act, I must uphold the ALJ's findings if substantial evidence supports them and they were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). This standard "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary

conflicts, including inconsistencies in the evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). It is not the role of this court to substitute its judgment for that of the Commissioner. *See id.*

Byrd implies that the ALJ erred in step three of the disability analysis by wrongly determining that Byrd's psychological disorders did not, either alone or in combination, meet or medically equal the criteria of the mental impairments listed under 20 C.F.R. pt. 404, subpt. P, app. 1 (2009) ("Appendix 1").[2] This finding can be dispositive because "an individual with an impairment(s) that meets or is equivalent in severity to the criteria of a listing could not reasonably be expected to do any gainful activity." *Id.* § 12.00(A); *see also* 20 C.F.R. §§ 416.925-26 (2009). In other words, if a claimant has an impairment that is the equivalent of one of those listed in Appendix 1, he is disabled.

---

[2] Byrd actually stated the issue as "[d]id the [ALJ] commit error by her total reliance upon non-examining personnel?" (Br. Supp. Pl.'s Mot. Summ. J. 5.) However, Byrd never states in his brief which of the ALJ's findings were suspect because of this "total reliance." In the argument section of his brief, Byrd claims that it was improper to rely on the non-examining medical consultants' opinions because they ignored "the parts of the record that prove the claimant's impairment was severe." *Id.* In fact, the ALJ found that Byrd's mental ailments were severe. What the ALJ rejected was the notion that Byrd's mental impairments were the equivalent of one of the psychological disabilities listed in Appendix 1.

It appears that Byrd is challenging the ALJ's conclusion under step three—that Byrd's severe psychological impairments are not the medical equivalent of any of the disabling conditions listed in Appendix 1—because the ALJ places the most reliance on the non-examining personnel's findings in making this determination.

The ALJ found that Byrd suffered from several severe mental impairments, substantively identical to those listed by the examining doctors: bipolar disorder or depression, borderline personality disorder, and a history of substance abuse; but the ALJ did not find that Byrd's impairments were debilitating to the degree required to match the disabling mental disorders in Appendix 1.

The ALJ compared the severity of Byrd's impairments to those listed under §§ 12.04, 12.08, and 12.09 of Appendix 1. Section 12.04 lists the criteria of a disabling affective disorder, including depression and bipolar disorder; § 12.08 lists the criteria of a personality disorder; and § 12.09 lists the criteria of a substance addiction disorder. 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.08-09 (2009). Severe impairments are considered the equivalent of the psychological disabilities in §§ 12.04, 12.08, or 12.09 if they result in at least two of the following "Paragraph B" limitations:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

*Id.* §§ 12.04, 12.08, 12.09(B), 12.09(D). "[Marked] means more than moderate but less than extreme." *Id.* § 12.00(C). "Repeated episodes of decompensation, each of extended duration" is defined as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* § 12.00(C)(4). If an affective disorder (§ 12.04) or a substance addiction (§ 12.09) does not meet the requirements of Paragraph B, then the symptoms must be evaluated under "Paragraph C" of § 12.04, which sets out alternative criteria for finding a disability. *See id.* §§ 12.04, 12.09(B). Under Paragraph C, the symptoms are disabling if the disorder has lasted at least two years,

> caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.* § 12.04(C). These additional criteria are intended to determine in cases in which psychosocial treatment or medication has ameliorated some or all of the claimant's

symptoms whether the severity would rebound once the claimant is placed in a workplace environment. *See id.* § 12.00(F)-(H).

The two non-examining medical consultants who evaluated Byrd's records to determine if he met the requirements of either Paragraph B or C, found that Byrd had moderate restrictions in activities of daily living, moderate difficulties in maintaining social function and concentration, persistence, and pace, and one to two episodes of decompensation and thus, did not meet the Paragraph B criteria. They also determined that Byrd did not meet the conditions of Paragraph C. The ALJ accepted these findings, and she too determined that Byrd's impairments did not meet the Paragraph B or C criteria. Byrd challenges this conclusion, claiming that the opinions of non-examining medical consultants were conclusory and contrary to those of examining doctors, and therefore could not be used to support any of the ALJ's findings. However, the evidence does not support Byrd's assertion.

The main problem with Byrd's argument is that not one physician, either treating, examining, or non-examining, found Byrd had mental impairments of the severity necessary to be disabling. According to Byrd, "the actual medical records" in this case come from only three sources, Cumberland psychiatrist Dr. Jeffery Gee, McFadden, and Dr. Tessnear, and all other opinions should be disregarded. (Br. Supp. Pl.'s Mot. Summ. J. 6.) However, not one of these three "actual" sources found

Byrd's functionality impaired to a degree "of equal medical significance to the [Paragraph B or C] criteria." 20 C.F.R. §§ 404.1526(b)(1), 416.926(b)(1) (2009). Therefore, assuming arguendo that the ALJ did err by relying on the non-examining consultants' opinions, that reliance did not prejudice Byrd because the examining and treating doctors' records support the ALJ's finding.

Addressing the Paragraph C criteria first, none of Byrd's medical records show that Byrd had "repeated episodes of decompensation, each of extended duration," the first prong of the paragraph's test. Byrd arguably did have two episodes of decompensation—his two attempts at suicide. In order to qualify as "[r]epeated episodes of decompensation, each of extended duration," however, he must have at least *three* episodes within one year, or an average of once every four months, each lasting for at least two weeks. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4) (2009). As to the second factor, none of the medical personnel noted that a minimal increase in mental demands or change in the environment would cause Byrd to decompensate. Nor was there any evidence presented to show that Byrd had a history of being unable to function outside a highly supportive living arrangement, the last criterium of Paragraph C. Finally, there were no findings by any of the medical personnel that were of equal medical significance to these Paragraph C requirements.

Byrd fairs no better under the Paragraph B standards. None of the medical personnel made findings that would be considered of equal medical significance to the Paragraph B criteria. Their significant conclusions, if any, fit under the functionality categories of paragraph B. Also, as discussed above, Byrd did not have "[r]epeated episodes of decompensation," the fourth Paragraph B factor. Consequently, the examining doctors would need to find that Byrd met two of the three remaining prongs of Paragraph B to have a disabling condition.

Dr. Gee, the only doctor to treat Byrd for a lengthy period, saw Byrd at Cumberland for medication management after Byrd's two suicide attempts in 2004. In the Cumberland records, Dr. Gee did not make any significant conclusions about Byrd's restrictions of daily living, social functioning, concentration, persistence, pace, or anything else related to his functionality. Therefore, Dr. Gee's opinion is completely devoid of anything that would help determine whether Byrd's symptoms met or equaled the paragraph B criteria.

McFadden did provide a functional assessment of Byrd. She tested his concentration and found it was "within normal limits" (R. at 283.) Accordingly, Byrd would not meet the concentration standard of Paragraph B. As to the other two criteria, although McFadden did conclude that it was likely Byrd would have difficulties interacting appropriately with coworkers and dealing with usual stressors

in competitive work, she did not indicate that Byrd had problems maintaining his daily life activities. In fact, McFadden noted that he was adequately dressed and drove himself and his girlfriend to the appointment. Consequently, McFadden's opinion falls short of establishing the two "marked" deficiencies necessary for a condition to be disabling under Paragraph B.

Finally, Dr. Tessnear concluded, like McFadden, that Byrd exhibited signs of poor social functioning but that Byrd did well on the concentration test. With regard to Byrd's daily activities, Dr. Tessnear noted that Byrd is able to do some cooking, use the microwave, make minor household repairs, do the shopping, use public transportation, pay the bills, and balance his checkbook. Thus, even though Dr. Tessnear felt Byrd's social functioning was markedly deficient, Byrd still fails to meet a second factor under Paragraph B. Significantly, Tessnear tried to verify her findings with a Personality Assessment Inventory test, but the results strongly indicated Byrd was a malingerer who was trying to deliberately feign severe symptoms of mental illness.

Accordingly, substantial evidence supports the ALJ's conclusion that Byrd's severe mental impairments did not qualify as one of the disabling mental illnesses listed in the federal regulations.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: April 1, 2010

/s/ JAMES P. JONES
Chief United States District Judge